**Penny NELSON, etc., Plaintiff,**

v.

**M. T. MUSTIAN et al., Defendants.**

**No. TCA 79–0909.**

United States District Court,
N. D. Florida,
Tallahassee Division.

Dec. 16, 1980.

Edward S. Stafman, Jerry G. Traynham, Tallahassee, Fla., for plaintiff.

John D. Buchanan, Jr., Tallahassee, Fla., for defendants.

## ORDER

HIGBY, District Judge.

### The Facts

Plaintiff, Penny Nelson, a registered nurse, was employed by Tallahassee Memorial Regional Medical Center (TMRMC) as an Evening Supervisor. The hospital had three Evening Supervisors who jointly supervised all nurses, orderlies, aides, licensed practical nurses, and unit clerks in the hospital on the 3:00 p.m. to 11:00 p.m. shift. On any given evening, only one or two supervisors would generally be present in the hospital since off days were rotated among the three. Ms. Nelson was regarded as a valuable employee and she received consistently superior evaluations.

Sometime in late October or early November of 1978, the Clinical Coordinators and Assistant Directors of Nursing discussed at their regular meeting a perceived lack of professionalism in the appearance of the hospital's employees. The Coordinators and Directors drew up a recommendation which was forwarded to Joan Williams, then Director of Nursing. This recommendation was essentially the final draft of a dress code which had been hammered out by an ad hoc committee chaired by Ms. Mildred Swilley, Assistant Director of Nursing, and composed of personnel from different levels of the nursing service staff. The final draft recommendation for the dress code was circulated throughout the hospital by Head Nurses and Supervisors, who were asked to get input on the proposal from their employees.

The original proposed dress code had specified that a wedding ring, an engagement ring, and one other ring could be worn while on duty. The ring provision was changed to require a maximum of three rings of any kind in an effort to avoid discrimination against those employees not married or engaged. The new dress code, and as part of it the three–ring maximum rule, was approved by the Head Nurses and Supervisors on January 24, 1979, and went into effect on February 5, 1979.

In the fall of 1978, the Plaintiff had heard discussion among the nurses that a revision of the dress code was being planned. In December of that year, Ms. Nelson had two discussions with Joan Williams, then her immediate supervisor, about the proposed ring rule. The Plaintiff says that she simply voiced her disagreement with the rule to Ms. Williams. Ms. Williams, however, testified in deposition that the Plaintiff stated she would not abide by any ring rule, even though the specific limitation on the number of rings permissible had not yet been determined.

Ms. Nelson did not attend the meetings of the Head Nurses and Supervisors at which the proposed dress code was discussed. In both her deposition and a letter to the Grievance Committee, she states that other, higher priorities in her work duties precluded her attendance at those meetings. She cites her conversations with Ms. Williams and with fellow supervisor Al Sparks (who did attend at least one meeting and expressed opposition to the new code) as evidence of her interest and involvement in the dress code issue.

When Ms. Nelson came to work on February 13, 1979, eight days after the new dress code went into effect, she was wearing seven rings, and she knew that she was in violation of the new code. Richard A. Corriveau, Associate Director of Nursing, spoke to the Plaintiff that evening about her noncompliance. According to the Plaintiff, Mr. Corriveau said, "Penny, you're going to have to make some changes," and she replied, "I've already spoken to Ms. Williams about how I feel about that." No one

disputes that this conversation referred to the rings Ms. Nelson was wearing.

The next evening, February 14, when Ms. Nelson came to work, Mr. Corriveau called her into his office, informed her that she was in violation of the dress code, and that she would either have to take off her excess rings or go home. As the Plaintiff related in her deposition (at page 33):

Nelson   He told me that if I did not take my rings off, I would be suspended and I would go home.

Q.   And what was your response to that?

Nelson   I said I would go home, and then I asked him what I was supposed to do next. And he said, well, you can come back tomorrow, and if you're in violation of the dress code tomorrow, you'll go home again.

Q.   And what was your response to that?

Nelson   I think I said, well, I guess there's not any need for me to get dressed and come to work and just go home.

Q.   And then what did you do?

Nelson   I went home.

As a result of her conversation with Mr. Corriveau, the Plaintiff was immediately suspended without pay. A form titled Notice of Corrective Action dated February 14, 1979, and signed by Richard Corriveau gives the reasons for the action as (1) failure to adhere to the dress code, (2) insubordination, (3) failure to support administrative decisions. Inexplicably, although the text of this document discusses suspension, the box labeled "written reprimand" is checked to indicate the action to be taken. Mr. Corriveau says that he simply checked the wrong box.

On the day after her suspension, Ms. Nelson spoke with Joan Williams, Director of Nursing Services, who tried to persuade her to take off her rings and come back to work. The Plaintiff stated that she did not plan to comply with the dress code and that she was going to resign. Joan Williams suggested that she think of the other employees and Ms. Nelson changed her mind and decided to go through the grievance procedure.

The hospital's Employee Handbook sets out a four–level procedure to be used in employee grievances, with the objective of resolution at the lowest management level. (TMRMC Employee Handbook at 41). The complaint should initially be discussed with the immediate supervisor, and if not resolved, it is then presented successively to: (1) Department Head or Head Nurse, (2) Vice President, (3) Executive Vice President, (4) Grievance Committee. Penny Nelson's grievance was heard by Richard Corriveau, Associate Director of Nursing; Joan Williams, Director of Nursing; R. C. Daniel, Executive Vice President; and a Grievance Committee composed of two members chosen by the administration, two members chosen by the complainant, and one member chosen by the other members of the Committee. At the first three levels, Corriveau's action of suspension without pay pending compliance with the dress code was upheld. After the Grievance Committee heard Ms. Nelson's complaint, it made the following recommendations on March 16, 1979:

1. It is the opinion of this Grievance Committee that the dress code should be modified with reference to the three ring rule; we as professionals can only defend a no ring rule.

2. The Grievance Committee further recommends:

   a. That Ms. Nelson be reinstated to her position of February 14, 1979 with the understanding that she will abide by the existing dress code;

   b. That there be no return of pay forfeited during Ms. Nelson's suspension;

   c. That no additional disciplinary action be taken against Ms. Nelson for her actions February 14, 1979;

   d. That Ms. Nelson be allowed the opportunity to pursue modifications of the existing dress code.

The Grievance Committee report produced a volume of correspondence between Ms. Nelson and M. T. Mustian, Chief Executive Officer at the hospital. Mr. Mustian wrote to the Plaintiff on March 21, 1979, to confirm a conversation of that same day and to give her formal notification of his acceptance of the Grievance Committee report. This letter also asks the Plaintiff to advise if she is willing to return to her position. Ms. Nelson's response said nothing about returning to work and, instead, sounded the theme that was to play throughout the ensuing developments: "All I am asking and have asked from the beginning is that someone in authority read my grievance and provide a detailed response." (Letter of Penny Nelson, March 22, 1979).

Ms. Nelson became convinced that no one had paid any attention to *her* grievance, which she called "modification of dress code and reinstatement from suspension with return of forfeited pay." She wanted to press her contention that the three–ring rule was arbitrarily developed and without rational foundation, and she wanted a solid ruling on this contention. The hospital's grievance procedure was focused, however, on the propriety of Mr. Corriveau's action in suspending her without pay pending compliance. To Ms. Nelson, these two questions; the validity of the ring rule and the propriety of her suspension, were inextricably tied. When Mr. Mustian in a letter of March 28, 1979, stated that the Grievance Committee was not charged with the task of defining or modifying the dress code and that he was accepting only those parts of their report dealing with her suspension (numbers 2a–d of the Committee's report), Ms. Nelson felt that the real issue had been sidestepped. Mr. Mustian again sought her decision on returning to employment at TMRMC and again the Plaintiff refused to either accept or reject her former job. In her letter of March 30, 1979, to Mustian, the Plaintiff set out clearly what she expected:

(1) modification of the dress code as outlined in my grievance (Feb. 19, 1979) to a rationally based, professionally–defensible policy;

(2) reinstatement and full reimbursement of forfeited pay.

When she did not get what she expected, she refused to return to her job, and on April 2, 1979, initiated an appeal to the

Municipal Hospital Board, anticipating that she would soon be terminated.[1]

Mr. Mustian's next letter to Ms. Nelson on April 20, 1979, stated:

I can only conclude that the recommendations of the special Grievance Committee are unacceptable to you as I have received no positive response to my letter of March 28, 1979. Therefore, we will proceed with the processing of your final paycheck in accordance with the *Employee Handbook.*

Please contact Mrs. Vernice McDonald, Director of Personnel Administration, if you have any questions concerning this process.

A carbon copy of this letter was sent to the Personnel Office and Mrs. Vernice McDonald filled out a form which resulted in the Plaintiff being dropped from the payroll. Mrs. McDonald testified in deposition that on the basis of Mr. Mustian's letter she determined that Ms. Nelson had abandoned her position and so marked the box for "Other," to show the reason for the action taken.[2] In accordance with the Employee Handbook, Ms. Nelson appealed her termination to the Hospital Board, which upheld the recommendations of the Grievance Committee and Mr. Mustian's subsequent action.

*The Plaintiff's Motion for Certification of the Classes and Partial Summary Judgment*

The Plaintiff has sued M. T. Mustian and Richard Corriveau in their individual and official capacities, TMRMC as an autonomous agency of the City of Tallahassee, and TMRMC as a non–profit corporation alleging denial of procedural due process in her termination and denial of substantive due process in making her subject to an arbitrary and capricious ring rule. In the complaint the Plaintiff asks the court to certify two classes for the awarding of injunctive and declaratory relief:

a. all persons who are, will be, or have been in the past four (4) years, permanent employees of Tallahassee Memorial Regional Medical Center, or its predecessors, excepting those past permanent employees who terminated their employment voluntarily and those employees who may have a conflict of interest with Plaintiff;

b. all persons who are, will be, or have, within the past four (4) years, been subject to the Tallahassee Memorial Regional Medical Center Nursing Service Department Dress Code.

The decision to allow a Plaintiff to maintain a class action rests within the sound discretion of the court, and I have concluded that the certification of these classes would be both unnecessary and improper. *Boggs v. Alto Trailer Sales, Inc.,* 511 F.2d 114 (5th Cir. 1975); *Gonzalez v. Southern Methodist University,* 536 F.2d 1071 (5th Cir. 1976). On cross motions for summary judgment and partial summary judgment, the facts of this case have been developed sufficiently to allow a reasoned inquiry on the class action issue.

Before an action can proceed under Rule 23, Federal Rules of Civil Procedure, the Plaintiff must show that the four requirements of subsection (a) are satisfied and that the action falls within one of the categories described in subsection (b). The Plaintiff alleges that this case would be a 23(b)(2) action, where the Defendant has acted or refused to act on grounds generally applicable to the class. I agree that a (b)(2) action might be appropriate here, were it not for the factual peculiarities of the Plaintiff's situation.

Ms. Nelson seeks to represent, in class number one, the interests of her former co- -workers who may have been deprived by the hospital of a property interest in their employment without procedural due proc-

---

1. All dissatisfactions with employment at TMRMC were to be handled through the grievance procedure, with the exception of terminations, which were appealable to the President and then to the Hospital Board. (Employee Handbook at 41).

2. The space marked "Reason" on the Personnel Action Request Form includes four possible responses: (1) WAN ·With Adequate Notice, (2) WON Without Adequate Notice, (3) DIS– Discharged, (4) OTH ·Other.

ess. The members of this putative class may be too numerous for practical joinder (Rule 23(a)(1)), and questions of law or fact common to the class could probably be found (Rule 23(a)(2)), but Ms. Nelson's individual case is so atypical as to make her an inadequate representative of the class (Rule 23(a)(3) and (4)). A great deal of evidence points to the conclusion that the Plaintiff abandoned her position at TMRMC. Before the actual effective date of the new dress code, she indicated that she would not comply with any limitation on the number of rings allowed. Her initial suspension by Mr. Corriveau was for direct refusal to comply with hospital policy and was conditional. Ms. Nelson could have returned to work at any time had she simply removed four of her seven rings. Several administration officials repeatedly asked Ms. Nelson to return to work, and she declined. Although the head of the hospital wrote two letters asking if she were willing to accept the recommendations of the Grievance Committee and return to work, she refused to say that she would return.

The Plaintiff's dissatisfactions and difficulties with the hospital are hardly typical of an employee who is discharged against her wishes. Ms. Nelson's individual situation is also affected by her status as a management level employee. As an Evening Supervisor, Ms. Nelson was charged not only with obeying but also with enforcing the new dress code. Her open and persistent refusal to do so created a situation devoid of the kinds of factual disputes generally found when an employee is fired. Ms. Nelson's interest in pursuing what was basically an ideological struggle with the hospital cannot be assumed to be congruent with the interests of lower-level employees seeking the protections of procedural due process for their jobs and livelihoods. The Plaintiff's claims are not typical of the class nor would she be an adequate representative of their interests.

Putative class number two, composed of employees subject to the dress code, is likewise flawed. The Plaintiff has not shown that this class is too numerous for practicable joinder. Although the total number of TMRMC employees subject to the dress code might meet the numerosity requirement, Plaintiff has not pointed out a single employee other than herself who has opposed the dress code. The court will not assume that all TMRMC employees object to the dress code, particularly since no fundamental right of the Plaintiff or proposed class is involved and all that the Defendant must show is a rational relationship between the dress code and a legitimate interest of the hospital. The most compelling reasons for denying certification of class number two are practical. Any equitable relief from the dress code obtained by the Plaintiff would inure to the benefit of other similarly situated employees, making invocation of the class action mechanism unnecessary. *Bridgeport Guard., Inc. v. Members of Bridgeport C. S. Comm.*, 354 F.Supp. 778, 783 (D.Conn.1973); *Bailey v. Patterson*, 323 F.2d 201, 206 (5th Cir. 1963). In addition, both the Plaintiff and the attorney who did most of the initial work on this case have moved from this area, raising questions about the propriety of allowing Ms. Nelson to represent any class.

Having decided against certifying the classes proposed by the Plaintiff, I do not rule on Plaintiff's Motion for Partial Summary Judgment on the question of whether the actions of TMRMC taken after its change of status to a non-profit corporation on June 30, 1979, continued to be state actions. On the date of the matters contested by the Plaintiff, the hospital was an autonomous agency of the City of Tallahassee, established by a special act of the Florida Legislature, regulated by City code and charter, and governed by a Municipal Hospital Board appointed by the City Commission. The actions taken by TMRMC with regard to Ms. Nelson in February and through June of 1979 were state actions.

*The Defendants' Motion for Summary Judgment*

Whether the ring rule and the entire TMRMC dress code for nurses, as it existed in February 1979, violate the sub-

stantive due process rights of the Plaintiff is a question of law for the court's determination. The due process clause of the Fourteenth Amendment ensures that state and local governments may act against individuals only within certain parameters. Citizens' fundamental rights may be limited only when the government can show that it is promoting a compelling or overriding interest. Fundamental rights include those specifically enumerated in the Bill of Rights plus a very small group of penumbral rights. *See, e. g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). When fundamental rights are not involved, a governmental act will be upheld if it is rationally related to any legitimate governmental objective:

> We think it plain that individual liberties may be ranked in a spectrum of importance. At one end of the spectrum are the great liberties such as speech, religion, and association specifically guaranteed in the Bill of Rights. Of equal importance are liberties such as the right of marital privacy that are so fundamental that, even in the absence of a positive command from the Constitution, they may be restricted only for compelling state interests. At the other end of the spectrum are the lesser liberties that may be invaded by the state subject only to the same minimum test of rationality that applies to all state action. *See, e. g., Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

*Karr v. Schmidt,* 460 F.2d 609, 615 (5th Cir. 1972).

This court has no doubt that Ms. Nelson's asserted right to wear an unlimited number of rings while working as a hospital nurse does not rise to the level of a fundamental freedom. The hospital need only show that the ring rule is rationally related to a permissible objective. The factual record presented in this case to date shows that the ring rule was developed by an ad hoc committee of nursing personnel charged with remedying a lack of professionalism in the appearance of hospital employees. The three–ring limitation evolved as a compromise to allow nurses to continue wearing wedding and engagement rings plus one other significant ring. (Deposition of Mildred K. Swilley). The fact that a compromise was struck between the safest and most hygienic option of no rings and the least restrictive option of unlimited rings does not render the resulting three–ring regulation arbitrary and capricious. Likewise, the later, contrary recommendation of the Grievance Committee that a no–ring policy be implemented only supports the notion that all policies of this type are properly the result of discretionary judgments which may differ yet still be reasonable.

Ms. Nelson's case is not analogous to that of the college teacher or college student whose hair style and amount of facial hair may not be dictated by the administration. *Hander v. San Jacinto Junior College,* 519 F.2d 273 (5th Cir. 1975), *rehearing on other grounds,* 522 F.2d 204 (1975); *Lansdale v. Tyler Junior College,* 470 F.2d 659 (5th Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973). The situation of the hospital nurse is much closer to that of the law enforcement or fire-fighting professional who works in a highly structured organization where life and death concerns are routine, and discipline and efficiency essential. *Yarbrough v. City of Jacksonville,* 363 F.Supp. 1176 (M.D.Fla.1973), *aff'd,* 504 F.2d 759 (5th Cir. 1974); *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). In cases such as Ms. Nelson's, "the burden is not upon the state to establish the rationality of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary." *Karr, supra,* at 617. The decision of the ad hoc committee to recommend a three–ring limit and the acceptance of this recommendation as hospital policy were not arbitrary actions. I can find nothing in the ring rule or the entire dress code which offends accepted tenets of substantive due process. The commentary of Judge Morgan in the *Karr* opinion is particularly apt in this situation:

> In conclusion, we emphasize that our decision today evinces not the slightest indifference to the personal rights asserted

by [this plaintiff and others]. Rather, it reflects recognition of the inescapable fact that neither the Constitution nor the federal judiciary it created were conceived to be keepers of the national conscience in every matter great or small. The regulations which impinge on our daily affairs are legion. Many of them are more intrusive and tenuous than the one involved here. The federal judiciary has urgent tasks to perform, and to be able to perform them we must recognize the physical impossibility that less than a thousand of us could ever enjoin a uniform concept of equal protection or due process on every American in every facet of his daily life.

*Karr, supra*, at 618.

The Defendants have asked the court to rule that the Plaintiff had no property interest in her job sufficient to permit her to invoke procedural due process protections. The case cited by the Defendants, *United Steelworkers of America AFL CIO v. University of Alabama*, 599 F.2d 56 (5th Cir. 1979), does not dictate a finding of no property interest in Ms. Nelson. *United Steelworkers* commands that an employee handbook dictating the terms of employment be read as a whole. *United Steelworkers* at 60. The TMRMC Employee Handbook (Handbook) contains conflicting provisions. Chapter Nine on terminations begins: "Since employment in this hospital is based on mutual consent, either the employee or the hospital is privileged to terminate employment." The types of termination are then described:

1. *Resigned*
   Employee initiated termination. This would be indicated as resigned with adequate notice or resigned without adequate notice.

2. *Retired*
   Employee requests retirement under the Florida Retirement System.

3. *Abandonment*
   Employee failed to report to work for three consecutive days without notifying department head.

4. *Discharge*
   Hospital initiated termination for cause.
Handbook at 46.

Numbers one through three above are employee-initiated terminations. Hospital-initiated termination is described in number four as "termination for cause." Again in Section 8.2 of the Handbook, dismissal is discussed in terms of cause: "Any failure to live up to the rules or any conduct that affects the efficient service of the Hospital gives cause for censure and possible dismissal." (Handbook at 45). Below this are listed twelve offenses serious enough to result in immediate dismissal.

■ When read in its entirety, the TMRMC Employee Handbook gives permanent employees a property interest in their employment. After serving a six–month probationary period, during which an employee may be dismissed without notice (Handbook at 8), a permanent employee may be dismissed only for cause. Under *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir. 1976), *vacated and remanded*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), *on remand*, 578 F.2d 1167 (1978), termination for cause creates a property interest in employment.

■ The remaining issue in this case, the allegation that the hospital denied Ms. Nelson's right to procedural due process by terminating her employment without the proper hearings, may be resolved by close scrutiny of those facts which are uncontested. Ms. Nelson was suspended without pay for repeated violation of the dress code. In some situations, the suspension of a permanent employee without pay may be the functional equivalent of termination, calling for the full accompaniment of protective procedures. *Thurston* at 1272. Ms. Nelson's suspension was not one of those situations, since absolutely no factual dispute was present. One day before her suspension, she was warned that she was not in compliance with the dress code. On the day of her suspension, she was given the choice of complying or going home, and she chose the latter course. Ms. Nelson knew of the

ring rule, knew she was wearing more than three rings, and knew that action against her was imminent. Neither the hospital nor Ms. Nelson faced any risk of a wrongful or mistaken factual determination in her suspension.

Even if the procedures mandated by *Thurston* were necessary here, they were followed in substance. There was no dispute as to the reason for Plaintiff's suspension; she was given an opportunity to rebut the charge when she spoke with Mr. Corriveau; and she responded orally to Mr. Corriveau, the person making the suspension decision. *Thurston* at 1273. Every one of these events occurred before the suspension became effective through Ms. Nelson's choice to continue wearing all seven of her rings.

The Plaintiff further claims that her ultimate termination by the hospital was undertaken without due process. She contends that the hospital initiated her termination and that she was never given an adequate hearing on the reasons for her discharge. Plaintiff's version of the facts turns almost entirely on semantics. After her suspension, the Plaintiff was asked at least four times to return to her job. She refused to return or to respond directly to inquiries about her future employment plans. Finally, after more than two months, the hospital processed her final check. Common sense allows no conclusion but that the Plaintiff effected her own termination. In such circumstances, no hearings of any kind are required. Due process is a flexible concept and application of its principles is a practical matter. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed. 725 (1975); *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The numerous appearances of this Plaintiff before her supervisors and superiors, the Grievance Committee, the hospital Chief Executive, and the Hospital Board afforded more due process than was required in this particular situation.

Accordingly, summary judgment is entered for all Defendants against the Plaintiff, with costs to be taxed to the Plaintiff.