# KELLEY, COMMISSIONER, SUFFOLK COUNTY POLICE DEPARTMENT *v.* JOHNSON

No. 74–1269.  Argued December 8, 1975—Decided April 5, 1976

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 249. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined,

*post,* p. 249. STEVENS, J., took no part in the consideration or decision of the case.

*Patrick A. Sweeney* argued the cause for petitioner. With him on the brief was *Howard E. Pachman.*

*Leonard D. Wexler* argued the cause for respondent. With him on the brief was *Richard T. Haefeli.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The District Court for the Eastern District of New York originally dismissed respondent's complaint seeking declaratory and injunctive relief against a regulation promulgated by petitioner limiting the length of a policeman's hair. On respondent's appeal to the Court of Appeals for the Second Circuit, that judgment was reversed, and on remand the District Court took testimony and thereafter granted the relief sought by respondent. The Court of Appeals affirmed, and we granted certiorari, 421 U. S. 987 (1975), to consider the constitutional doctrine embodied in the rulings of the Court of Appeals. We reverse.

I

In 1971 respondent's predecessor, individually and as president of the Suffolk County Patrolmen's Benevolent Association, brought this action under the Civil Rights Act of 1871, 42 U. S. C. § 1983, against petitioner's predecessor, the Commissioner of the Suffolk County Police Department. The Commissioner had promulgated Order No. 71-1, which established hair-grooming standards applicable to male members of the police force.[1] The

---

*James vanR. Springer* filed a brief for the International Brotherhood of Police Officers as *amicus curiae* urging affirmance.

[1] Order No. 71-1 (1971), amending Chapter 2 of the Rules and Procedures, Police Department, County of Suffolk, N. Y., provided:

"2/75.0  Members of the Force and Department shall be neat and

regulation was directed at the style and length of hair, sideburns, and mustaches; beards and goatees were prohibited, except for medical reasons; and wigs conforming to the regulation could be worn for cosmetic reasons. The regulation was attacked as violative of respondent patrolman's right of free expression under the First Amendment and his guarantees of due process and equal

clean at all times while on duty. Male personnel shall comply with the following grooming standards unless excluded by the Police Commissioner due to special assignment:

"2/75.1 HAIR: Hair shall be neat, clean, trimmed, and present a groomed appearance. Hair will not touch the ears or the collar except the closely cut hair on the back of the neck. Hair in front will be groomed so that it does not fall below the band of properly worn headgear. In no case will the bulk or length of the hair interfere with the proper wear of any authorized headgear. The acceptability of a member's hair style will be based upon the criteria in this paragraph and not upon the style in which he chooses to wear his hair.

"2/75.2 SIDEBURNS: If an individual chooses to wear sideburns, they will be neatly trimmed and tapered in the same manner as his haircut. Sideburns will not extend below the lowest part of the exterior ear opening, will be of even width (not flared), and will end with a clean-shaven horizontal line.

"2/75.3 MUSTACHES: A short and neatly trimmed mustache may be worn, but shall not extend over the top of the upper lip or beyond the corners of the mouth.

"2/75.4 BEARDS & GOATEES: The face will be clean-shaven other than the wearing of the acceptable mustache or sideburns. Beards and goatees are prohibited, except that a Police Surgeon may grant a waiver for the wearing of a beard for medical reasons with the approval of the Police Commissioner. When a Surgeon prescribes that a member not shave, the beard will be kept trimmed symmetrically and all beard hairs will be kept trimmed so that they do not protrude more than one-half inch from the skin surface of the face.

"2/75.5 WIGS: Wigs or hair pieces will not be worn on duty in uniform except for cosmetic reasons to cover natural baldness or physical disfiguration. If under these conditions, a wig or hair piece is worn, it will conform to department standards." App. 57–58.

protection under the Fourteenth Amendment, in that it was "not based upon the generally accepted standard of grooming in the community" and placed "an undue restriction" upon his activities therein.

The Court of Appeals held that cases characterizing the uniformed civilian services as "para-military," and sustaining hair regulations on that basis, were not soundly grounded historically.[2]  It said that the fact that a police force is organized "with a centralized administration and a disciplined rank and file for efficient conduct of its affairs" did not foreclose respondent's claim, but instead bore only upon "the existence of a legitimate state interest to be reasonably advanced by the regulation." *Dwen* v. *Barry*, 483 F. 2d 1126, 1128–1129 (1973).  The Court of Appeals went on to decide that "choice of personal appearance is an ingredient of an individual's personal liberty"[3] and is protected by the Fourteenth Amendment.  It further held that the police department had "failed to make the slightest showing of the relationship between its regulation and the legitimate interest it sought to promote." *Id.*, at 1130–1131.  On the basis of this reasoning it concluded that neither dismissal nor summary judgment in the District Court was appropriate, since the department "has the burden of establishing

[2] *E. g., Stradley* v. *Andersen,* 478 F. 2d 188 (CA8 1973); *Greenwald* v. *Frank,* 40 App. Div. 2d 717, 337 N. Y. S. 2d 225 (1972), aff'd without opinion, 32 N. Y. 2d 862, 299 N. E. 2d 895 (1973).  The District Court's dismissal was based on cases upholding the discretionary power of the military and National Guard to regulate a soldier's hair length.  See *Gianatasio* v. *Whyte,* 426 F. 2d 908 (CA2), cert. denied, 400 U. S. 941 (1970); *Raderman* v. *Kaine,* 411 F. 2d 1102 (CA2), cert. dismissed, 396 U. S. 976 (1969).

[3] 483 F. 2d, at 1130.  While it recognized the distinction between citizens and uniformed employees of police and fire departments, the Court of Appeals stated that the individual's status did not bear on the existence of his right but on whether the right was outweighed by a legitimate state interest. *Id.*, at 1130 n. 9.

a genuine public need for the regulation." *Id.,* at 1131.

Thereafter the District Court, under the compulsion of the remand from the Court of Appeals, took testimony on the question of whether or not there was a "genuine public need." The sole witness was the Deputy Commissioner of the Suffolk County Police Department, petitioner's subordinate, who testified as to the police department's concern for the safety of the patrolmen, and the need for some standards of uniformity in appearance.[4] The District Court held that "[n]o proof" was offered to support any claim of the need for the protection of the police officer, and that while "proper grooming" is an ingredient of a good police department's esprit de

---

[4] On remand, the complaint was appropriately amended to reflect the interim renumbering and modification of the hair-grooming regulation. The former sections 2/75.0–2/75.3, see n. 1, *supra,* were modified to provide as follows:

"Members of the Force will be neat and clean at all times while on duty. Male personnel will comply with the following grooming standards unless excluded by the Police Commissioner due to special assignments:

"A. Hair will be neat, clean, trimmed and present a groomed appearance. Hair will not go below the ears or the collar except the closely cut hair on the back of the neck. Pony tails are prohibited. In no case will the bulk or length of the hair interfere with the proper wear of any authorized headgear.

"B. If a member chooses to wear sideburns, they will be neatly trimmed. Sideburns will not extend below the lowest part of the ear. Sideburns shall not be flared beyond 2″ in width and will end with a clean-shaven horizontal line. Sideburns shall not connect with the mustache.

"C. A neatly trimmed mustache may be worn." Rules and Procedures, Police Department, County of Suffolk, N. Y., 2/2.16 (hereinafter Rules and Procedures).

Sections 2/75.4–2/75.5, see n. 1, *supra,* were simply renumbered as 2/2.16, subdivisions D and E, respectively. Deputy Commissioner Rapp's testimony on remand was directed to the regulation as modified. For present purposes, the differences are immaterial.

corps, petitioner's standards did not establish a public need because they ultimately reduced to "[u]niformity for uniformity's sake."[5]  The District Court granted the

---

[5] Illustrating one safety problem, Rapp showed that an assailant could throw an officer off balance by grabbing his hair from the rear and levering against the patrolman's back.  After noting that the prohibition against "ponytails" was thus a proper one, the District Court stated:

"The remainder of 2/2.16A, however, bears no relationship to safety but rather related to hair styling.  The potential danger in hairdress is the ability of the offender to grip the hair and hold the fate of the police officer in his hand.  Bulk and length of the hair is not regulated except as it interferes with 'the proper wear of any authorized headgear.'  Thus the regulation would permit bulky and lengthy hair on the top of the head, thereby presenting the very problem that was demonstrated.  In the remaining subdivisions, sideburns, mustaches and wigs are regulated and beards are barred.  No proof was offered to support any claim of the need for the protection of the police officer in the pertinent regulations."  Pet. for Cert. 7a.

The District Court's findings with respect to the relationship between morale and grooming standards are as follows:

"The high morale of police personnel is a matter of grave concern to the department.  Proper grooming is an ingredient of the esprit de corps of a good law enforcement organization.  The self-esteem generated in the individual and the respect commanded from the public it serves promotes [sic] the efficiency of the organization's work.  However, with the exception of the general requirement that hair, sideburns and mustaches be neatly trimmed, the regulations do not provide standards for proper grooming.  Rather, the standards do nothing more than demand uniformity.  Uniformity for uniformity's sake does not establish a public need.  Defendant offered no proof that beards, goatees, hair styles that extend below the ears or collar, or sideburns that extend below the lowest part of the ear or beyond 2″ in width and do not end with a clean-shaven horizontal line affect the morale of the members of the police department or earn the disrespect of the public."  Id., at 7a–8a.

While noting Rapp's testimony that uniformity was required for identification, the District Court stated: "It would appear, however,

relief prayed for by respondent, and on petitioner's appeal that judgment was affirmed without opinion by the Court of Appeals. 508 F. 2d 836.

## II

Section 1 of the Fourteenth Amendment to the United States Constitution provides in pertinent part:

> "No State shall . . . deprive any person of life, liberty, or property, without due process of law."

This section affords not only a procedural guarantee against the deprivation of "liberty," but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State. *Board of Regents* v. *Roth,* 408 U. S. 564, 572 (1972); *Griswold* v. *Connecticut,* 381 U. S. 479, 502 (1965) (WHITE, J., concurring).

The "liberty" interest claimed by respondent here, of course, is distinguishable from the interests protected by the Court in *Roe* v. *Wade,* 410 U. S. 113 (1973); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Stanley* v. *Illinois,* 405 U. S. 645 (1972); *Griswold* v. *Connecticut, supra;* and *Meyer* v. *Nebraska,* 262 U. S. 390 (1923). Each of those cases involved a substantial claim of infringement on the individual's freedom of choice with respect to certain basic matters of procreation, marriage, and family life. But whether the citizenry at large has some sort of "liberty" interest within the Fourteenth Amendment in matters of personal appearance is a question on which this Court's cases offer little, if any, guidance. We can, nevertheless, assume an affirmative answer for purposes of deciding this case, because we find that assumption insufficient to carry the day for respondent's claim.

Respondent has sought the protection of the Four-

---

that the uniform (issued by the department) supplies the necessary identification for police work."

teenth Amendment, not as a member of the citizenry at large, but on the contrary as an employee of the police department of Suffolk County, a subdivision of the State of New York. While the Court of Appeals made passing reference to this distinction, it was thereafter apparently ignored. We think, however, it is highly significant. In *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968), after noting that state employment may not be conditioned on the relinquishment of First Amendment rights, the Court stated that "[a]t the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." More recently, we have sustained comprehensive and substantial restrictions upon activities of both federal and state employees lying at the core of the First Amendment. *CSC* v. *Letter Carriers*, 413 U. S. 548 (1973); *Broadrick* v. *Oklahoma*, 413 U. S. 601 (1973). If such state regulations may survive challenges based on the explicit language of the First Amendment, there is surely even more room for restrictive regulations of state employees where the claim implicates only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment.

The hair-length regulation here touches respondent as an employee of the county and, more particularly, as a policeman. Respondent's employer has, in accordance with its well-established duty to keep the peace, placed myriad demands upon the members of the police force, duties which have no counterpart with respect to the public at large. Respondent must wear a standard uniform, specific in each detail.[6] When in uniform he must

---

[6] Rules and Procedures 4/1.0–4/1.3.

salute the flag.[7]  He may not take an active role in local political affairs by way of being a party delegate or contributing or soliciting political contributions.[8]  He may not smoke in public.[9]  All of these and other regulations [10] of the Suffolk County Police Department infringe on respondent's freedom of choice in personal matters, and it was apparently the view of the Court of Appeals that the burden is on the State to prove a "genuine public need" for each and every one of these regulations.

This view was based upon the Court of Appeals' reasoning that the "unique judicial deference" accorded by the judiciary to regulation of members of the military was inapplicable because there was no historical or functional justification for the characterization of the police as "para-military."  But the conclusion that such cases are inapposite, however correct, in no way detracts from the deference due Suffolk County's choice of an organizational structure for its police force.  Here the county has chosen a mode of organization which it undoubtedly deems the most efficient in enabling its police to carry out the duties assigned to them under state and local law.[11]  Such a choice necessarily gives weight to the overall need for discipline, esprit de corps, and uniformity.

The county's choice of an organizational structure, therefore, does not depend for its constitutional validity on any doctrine of historical prescription.  Nor, indeed, has respondent made any such claim.  His argument does

[7] *Id.,* 6/2.2.

[8] *Id.,* 2/2.5.

[9] *Id.,* 2/5.1.

[10] See, *e. g., id.,* 2/14.0 *et seq.* (Code of Ethics).

[11] The Court of Appeals itself found that while there was no desire on the part of local governments like Suffolk County to create a "military force," "[t]he use of such organization evolved as a *practical administrative solution* . . . ."  483 F. 2d, at 1128–1129 (emphasis added).

not challenge the constitutionality of the organizational structure, but merely asserts that the present hair-length regulation infringes his asserted liberty interest under the Fourteenth Amendment. We believe, however, that the hair-length regulation cannot be viewed in isolation, but must be rather considered in the context of the county's chosen mode of organization for its police force.

The promotion of safety of persons and property is unquestionably at the core of the State's police power, and virtually all state and local governments employ a uniformed police force to aid in the accomplishment of that purpose. Choice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power. *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U. S. 421, 423 (1952); *Prince* v. *Massachusetts*, 321 U. S. 158, 168–170 (1944); *Olsen* v. *Nebraska*, 313 U. S. 236, 246–247 (1941). Having recognized in other contexts the wide latitude accorded the government in the "dispatch of its own internal affairs," *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 896 (1961), we think Suffolk County's police regulations involved here are entitled to similar weight. Thus the question is not, as the Court of Appeals conceived it to be, whether the State can "establish" a "genuine public need" for the specific regulation. It is whether respondent can demonstrate that there is no rational connection between the regulation, based as it is on the county's method of organizing its police force, and the promotion of safety of persons and property. *United Public Workers* v. *Mitchell*, 330 U. S. 75, 100–101 (1947); *Jacobson* v. *Massachusetts*, 197 U. S. 11, 30–31, 35–37 (1905).

We think the answer here is so clear that the District Court was quite right in the first instance to have dis-

missed respondent's complaint. Neither this Court, the Court of Appeals, nor the District Court is in a position to weigh the policy arguments in favor of and against a rule regulating hairstyles as a part of regulations governing a uniformed civilian service. The constitutional issue to be decided by these courts is whether petitioner's determination that such regulations should be enacted is so irrational that it may be branded "arbitrary," and therefore a deprivation of respondent's "liberty" interest in freedom to choose his own hairstyle. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 487–488 (1955). The overwhelming majority of state and local police of the present day are uniformed. This fact itself testifies to the recognition by those who direct those operations, and by the people of the States and localities who directly or indirectly choose such persons, that similarity in appearance of police officers is desirable. This choice may be based on a desire to make police officers readily recognizable to the members of the public, or a desire for the esprit de corps which such similarity is felt to inculcate within the police force itself. Either one is a sufficiently rational justification for regulations so as to defeat respondent's claim based on the liberty guarantee of the Fourteenth Amendment.

The Court of Appeals relied on *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), and *amicus* in its brief in support of respondent elaborates an argument based on the language in *Garrity* that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Id.,* at 500. *Garrity,* of course, involved the protections afforded by the Fifth Amendment to the United States Constitution as made applicable to the States by the Fourteenth Amendment. *Malloy* v. *Hogan,* 378 U. S. 1 (1964). Certainly its language cannot be taken to suggest that the claim of a member

of a uniformed civilian service based on the "liberty" interest protected by the Fourteenth Amendment must necessarily be treated for constitutional purposes the same as a similar claim by a member of the general public.

The regulation challenged here did not violate any right guaranteed respondent by the Fourteenth Amendment to the United States Constitution, and the Court of Appeals was therefore wrong in reversing the District Court's original judgment dismissing the action. The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, concurring.

I concur in the opinion of the Court and write to make clear that, contrary to the concern expressed in the dissent, I find no negative implication in the opinion with respect to a liberty interest within the Fourteenth Amendment as to matters of personal appearance. See *Poe* v. *Ullman,* 367 U. S. 497, 541–543 (1961) (Harlan, J., dissenting). When the State has an interest in regulating one's personal appearance, as it certainly does in this case, there must be a weighing of the degree of infringement of the individual's liberty interest against the need for the regulation. This process of analysis justifies the application of a reasonable regulation to a uniformed police force that would be an impermissible intrusion upon liberty in a different context.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court today upholds the constitutionality of Suffolk County's regulation limiting the length of a police-

man's hair.  While the Court only assumes for purposes of its opinion that "the citizenry at large has some sort of 'liberty' interest within the Fourteenth Amendment in matters of personal appearance . . . ," *ante*, at 244, I think it clear that the Fourteenth Amendment does indeed protect against comprehensive regulation of what citizens may or may not wear.  And I find that the rationales offered by the Court to justify the regulation in this case are insufficient to demonstrate its constitutionality.  Accordingly, I respectfully dissent.

## I

As the Court recognizes, the Fourteenth Amendment's guarantee against the deprivation of liberty "protects substantive aspects of liberty against unconstitutional restrictions by the State."  *Ante*, at 244.  And we have observed that "[l]iberty under law extends to the full range of conduct which the individual is free to pursue." *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954).  See also *Poe* v. *Ullman*, 367 U. S. 497, 543 (1961) (Harlan, J., dissenting).[1]  It seems to me manifest that that "full range of conduct" must encompass one's interest in dressing according to his own taste.  An individual's personal appearance may reflect, sustain, and nourish his personality and may well be used as a means of expressing his

---

[1] We have held that the Constitution's protection of liberty encompasses the interest of parents in having their children learn German, *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); the interest of parents in being able to send their children to private as well as public schools, *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925); the interest of citizens in traveling abroad, *Kent* v. *Dulles*, 357 U. S. 116, 125 (1958); *Aptheker* v. *Secretary of State*, 378 U. S. 500, 505 (1964); the interest of a woman in deciding whether or not to terminate her pregnancy, *Roe* v. *Wade*, 410 U. S. 113, 153 (1973); and the interest of a student in the damage to his reputation caused by a 10-day suspension from school.  *Goss* v. *Lopez*, 419 U. S. 565, 574–575 (1975).

attitude and lifestyle.[2]    In taking control over a citizen's personal appearance, the government forces him to sacrifice substantial elements of his integrity and identity as well.    To say that the liberty guarantee of the Fourteenth Amendment does not encompass matters of personal appearance would be fundamentally inconsistent with the values of privacy, self-identity, autonomy, and personal integrity that I have always assumed the Constitution was designed to protect.    See *Roe* v. *Wade,* 410 U. S. 113 (1973); *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969); *Griswold* v. *Connecticut,* 381 U. S. 479, 485 (1965); *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

If little can be found in past cases of this Court or indeed in the Nation's history on the specific issue of a citizen's right to choose his own personal appearance, it is only because the right has been so clear as to be beyond question.    When the right has been mentioned, its existence has simply been taken for granted. For instance, the assumption that the right exists is reflected in the 1789 congressional debates over which guarantees should be explicitly articulated in the Bill of Rights.    I. Brant, The Bill of Rights 53–67 (1965). There was considerable debate over whether the right of assembly should be expressly mentioned.    Congressman 'Benson of New York argued that its inclusion was necessary to assure that the right would not be infringed by the government.    In response, Congressman Sedgwick of Massachusetts indicated:

"If the committee were governed by that general

---

[2] While the parties did not address any First Amendment issues in any detail in this Court, governmental regulation of a citizen's personal appearance may in some circumstances not only deprive him of liberty under the Fourteenth Amendment but violate his First Amendment rights as well.    *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969).

principle . . . they might have declared that *a man should have a right to wear his hat if he pleased* . . . but [I] would ask the gentleman whether he thought it necessary to enter these trifles in a declaration of rights, *in a Government where none of them were intended to be infringed."* *Id.,* at 54–55 (emphasis added).

Thus, while they did not include it in the Bill of Rights, Sedgwick and his colleagues clearly believed there to be a right in one's personal appearance. And, while they may have regarded the right as a trifle as long as it was honored, they clearly would not have so regarded it if it were infringed.

This Court, too, has taken as an axiom that there is a right in one's personal appearance.[3] Indeed, in 1958 we used the existence of that right as support for our recognition of the right to travel:

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment. . . . *It may be as close to the heart of the individual as the choice*

---

[3] There has been a substantial amount of lower-court litigation concerning the constitutionality of hair-length and dress-code regulations as applied to schoolchildren. Some of the cases have found the rationales offered for such regulations to be sufficient to support their constitutionality. See, *e. g., King* v. *Saddleback Junior College Dist.,* 445 F. 2d 932 (CA9), cert. denied, 404 U. S. 979 (1971); *Gfell* v. *Rickelman,* 441 F. 2d 444 (CA6 1971); *Ferrell* v. *Dallas Independent School Dist.,* 392 F. 2d 697 (CA5), cert. denied, 393 U. S. 856 (1968). Other cases have found similar regulations unconstitutional. See, *e. g., Richards* v. *Thurston,* 424 F. 2d 1281 (CA1 1970); *Breen* v. *Kahl,* 419 F. 2d 1034 (CA7 1969), cert. denied, 398 U. S. 937 (1970). None of the cases, however, have indicated that the Constitution may offer no protection at all against comprehensive regulation of the personal appearance of the citizenry at large.

*of what he eats, or wears, or reads." Kent v. Dulles,* 357 U. S. 116, 125- 126 (1958) (emphasis added).

To my mind, the right in one's personal appearance is inextricably bound up with the historically recognized right of "every individual to the possession and control of his own person," *Union Pacific R. Co. v. Botsford,* 141 U. S. 250, 251 (1891), and, perhaps even more fundamentally, with "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States, supra,* at 478 (Brandeis, J., dissenting). In an increasingly crowded society in which it is already extremely difficult to maintain one's identity and personal integrity, it would be distressing, to say the least, if the government could regulate our personal appearance unconfined by any constitutional strictures whatsoever.[4]

---

[4] History is dotted with instances of governments regulating the personal appearance of their citizens. For instance, in an effort to stimulate his countrymen to adopt a modern lifestyle, Peter the Great issued an edict in 1698 regulating the wearing of beards throughout Russia. W. & A. Durant, The Age of Louis XIV, p. 398 (1963). Anyone who wanted to grow a beard had to pay an annual tax of from one kopek for a peasant to one hundred rubles for a rich merchant. *Ibid.* Of those who could not afford the "beard tax," there were many "who, after having their beards shaved off, saved them preciously, in order to have them placed in their coffins, fearing that they would not be allowed to enter heaven without them." J. Robinson, Readings in European History 390 (1906).

There are more recent instances, too, of governments regulating the personal appearance of their citizens. See, *e. g.,* N. Y. Times, Feb. 18, 1974, p. 22, col. 4 (Czech police stop long-haired young men, telling them to get haircuts); *id.,* July 23, 1972, p. 4, col. 1 (Libyan Government tells youths to trim hair and wear more sober clothes or submit themselves for training in the army); *id.,* July 7, 1971, p. 22, col. 8 (over 1,000 young men rounded up and given haircuts by South Korean police in what was described by government officials as a "social purification" campaign); *id.,* Oct. 13, 1970, p. 11, col. 1 (police force more than 1,400 South Vietnamese youths to cut

## II

Acting on its assumption that the Fourteenth Amendment does encompass a right in one's personal appearance, the Court justifies the challenged hair-length regulation on the grounds that such regulations may "be based on a desire to make police officers readily recognizable to the members of the public, or a desire for the esprit de corps which such similarity is felt to inculcate within the police force itself." *Ante,* at 248. While fully accepting the aims of "identifiability" and maintenance of esprit de corps, I find no rational relationship between the challenged regulation and these goals.[5]

As for the first justification offered by the Court, I simply do not see how requiring policemen to maintain hair of under a certain length could rationally be argued to contribute to making them identifiable to the public as policemen. Surely, the fact that a uniformed police officer is wearing his hair below his collar will make him

their hair). It is inconceivable to me that the Constitution would offer no protection whatsoever against the carrying out of similar actions by either our Federal or State Governments.

[5] A policeman does not surrender his right in his own personal appearance simply by joining the police force. See *Tinker* v. *Des Moines School Dist.,* 393 U. S., at 506. I agree with the Court of Appeals that the "status of the individual raising the claim bears [not on the existence of the right, but rather] on the question of whether the right is outweighed by a legitimate state interest." 483 F. 2d, at 1130 n. 9. Thus, the need to evaluate the governmental interest and the connection between it and the challenged governmental action is as present when the party whose rights have allegedly been violated is a public employee as when he is a private employee. See *CSC* v. *Letter Carriers,* 413 U. S. 548, 564–567 (1973). To hold that citizens somehow automatically give up constitutional rights by becoming public employees would mean that almost 15 million American citizens are currently affected by having "executed" such "automatic waivers." Statistical Abstract of the United States 1975, p. 272.

no less identifiable as a policeman. And one cannot easily imagine a plainclothes officer being readily identifiable as such simply because his hair does not extend beneath his collar.

As for the Court's second justification, the fact that it is the president of the Patrolmen's Benevolent Association, in his official capacity, who has challenged the regulation here would seem to indicate that the regulation would if anything, decrease rather than increase the police force's esprit de corps.[6] And even if one accepted the argument that substantial similarity in appearance would increase a force's esprit de corps, I simply do not understand how implementation of this regulation could be expected to create any increment in similarity of appearance among members of a uniformed police force. While the regulation prohibits hair below the ears or the collar and limits the length of sideburns, it allows the maintenance of any type of hairstyle, other than a ponytail. Thus, as long as their hair does not go below their collars, two police officers, one with an "Afro" hair style and the other with a crewcut could both be in full compliance with the regulation.[7]

---

[6] Nor, to say the least, is the esprit de corps argument bolstered by the fact that the International Brotherhood of Police Officers, a 25,000-member union representing uniformed police officers, has filed a brief as *amicus curiae* arguing that the challenged regulation is unconstitutional.

[7] The regulation itself eschews what would appear to be a less intrusive means of achieving similarity in the hair length of on-duty officers. According to the regulation, a policeman cannot comply with the hair-length requirements by wearing a wig with hair of the proper length while on duty. The regulation prohibits the wearing of wigs or hairpieces "on duty in uniform except for cosmetic reasons to cover natural baldness or physical disfiguration." *Ante*, at 240 n. 1. Thus, while the regulation in terms applies to grooming standards of policemen while on duty, the hair-length provision effectively controls both on-duty and off-duty appearance.

The Court cautions us not to view the hair-length regulation in isolation, but rather to examine it "in the context of the county's chosen mode of organization for its police force." *Ante*, at 247. While the Court's caution is well taken, one should also keep in mind, as I fear the Court does not, that what is ultimately under scrutiny is neither the overall structure of the police force nor the uniform and equipment requirements to which its members are subject, but rather the regulation which dictates acceptable hair lengths. The fact that the uniform requirement, for instance, may be rationally related to the goals of increasing police officer "identifiability" and the maintenance of esprit de corps does absolutely nothing to establish the legitimacy of the hair-length regulation. I see no connection between the regulation and the offered rationales [8] and would accordingly affirm the judgment of the Court of Appeals.

---

[8] Because, to my mind, the challenged regulation fails to pass even a minimal degree of scrutiny, there is no need to determine whether, given the nature of the interests involved and the degree to which they are affected, the application of a more heightened scrutiny would be appropriate.