TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | | |
|---|---|---|
| OPINION | : | No. 91-811 |
| of | : | |
| | : | JUNE 4, 1992 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE DWIGHT L. HERR, COUNTY COUNSEL, COUNTY OF SANTA CRUZ, has requested an opinion on the following question:

Is the University of California bound by the provisions of the Subdivision Map Act when it constructs for-sale on-campus homes as part of a program to provide faculty housing?

CONCLUSION

The University of California is not bound by the provisions of the Subdivision Map Act when it constructs for-sale on-campus homes as part of a program to provide faculty housing.

ANALYSIS

We are informed that the University of California (hereinafter "University") has established a program whereby property lying wholly within a University campus may be utilized for the construction of faculty housing. The land is leased on a long-term basis to the faculty member through a non-profit University affiliate. The University retains the right to repurchase the home on the leased property if the owner's employment is terminated. Various other restrictions ensure that the University may maintain the property as part of its faculty housing stock. Being situated on campus and sold as close to cost as possible, the homes serve as a significant inducement in the recruitment and retention of faculty members for the University.

We are asked whether the University, in the process of creating the lots upon which the faculty homes are built, must comply with the provisions of the Subdivision Map Act (Gov.

Code, §§ 66410-66599.37; hereinafter "Act").[1] We conclude that under these circumstances, the Act is inapplicable to the University's management of its property.

The Act generally requires that before property may be subdivided, a subdivision map must be prepared by the subdivider and be approved by the governing body of the city or county in which the land is located. (See 7 Miller & Starr, Current Law of Cal. Real Estate (2nd ed. 1990) § 20:77, pp. 189-191; 2 Ogden's Revised Cal. Real Property Law (1975) § 25.2, p. 1205.) With certain exceptions, the specific requirements of the Act are to design the subdivision in conformity with the local general plan, construct public purpose improvements such as streets and sewers, and donate land or money for public uses such as parks and schools. (§§ 66439, 66473.1, 66473.5, 66474, 66474.01, 66474.2, 66474.5-66474.10, 66475-66478; 3 Witkin, Summary of Law (9th ed. 1987) Real Property, §§ 49-50, pp. 265-268.) The purposes of the legislation are to (1) promote orderly community development, (2) insure proper improvement of the areas within the subdivision that are dedicated for public purposes by the subdivider, and (3) prevent fraud and exploitation by the subdivider. (*Bright* v. *Board of Supervisors* (1977) 66 Cal.App.3d 191, 195-196; *Pratt* v. *Adams* (1964) 229 Cal.App.2d 602, 606; 56 Ops.Cal.Atty.Gen. 496, 497 (1973).)

In *Morris* v. *Reclamation District No. 108* (1941) 17 Cal.2d 43, the Supreme Court ruled that the Act was inapplicable to public agencies creating subdivisions authorized by law. The court stated:

" . . . It is first urged that the map that was filed in connection with the proceeding leading up to the reapportionment did not comply with the Subdivision Map Act . . . in many respects. It is pointed out that the map that was filed was not signed by the county treasurer, as owner; that the state was a part owner of the tract; and that the state controller had no power to join in making the subdivision; that the certificate of the state controller dedicating certain roadways was not acknowledged. The complete answer to these contentions is . . . that the . . . Map Act, *supra*, does not apply to subdivisions of land by a reclamation district, or in fact to subdivisions by any public agency or public officer, where such subdivisions are authorized by law." (*Id.* at p. 53.)

In 62 Ops.Cal.Atty.Gen. 140 (1979), we distinguished *Morris* in considering whether the Act applied to the sale of 75 contiguous parcels by the Department of Transportation. We explained:

"We are aware that in *Morris* v. *Reclamation District No. 108* (1941) 17 Cal.2d 43, 53, the Supreme Court appears to indicate that the provisions of the Act are inapplicable to all public agencies `where such subdivisions are authorized by law.' *Morris* . . . concerned a statute that gave the public agency in question the authority to subdivide property in the furtherance of its governmental responsibilities. Such activities thus came within the general principle of sovereign immunity and the exception to the rule was inapplicable. . . . Accordingly, a broad reading of *Morris* to the effect that the general provisions of the Act are inapplicable even when sovereign powers are not impaired would be inappropriate and inconsistent with the more recent pronouncements by the Supreme Court in such cases as *Regents of University of California* v. *Superior Court, supra,* 17 Cal.3d 533,

_____

[1] All section references hereinafter are to the Government Code unless otherwise specified.

536, and *City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d 199, 276-277." (*Id.* at pp. 142-143.)[2]

Our 1979 opinion referred to "the general principle of sovereign immunity and the exception to the rule." In *Regents of University of California* v. *Superior Court* (1976) 17 Cal.3d 533, 536, the Supreme Court expressed these canons of statutory construction with respect to the activities of the University:

". . . `[I]n the absence of express words to the contrary, neither the state nor its subdivisions are included within the general words of a statute. [Citations.] But this rule excludes governmental agencies from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers. "Where . . . no impairment of sovereign powers would result, the reason underlying this rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only." (*Hoyt* v. *Board of Civil Service Commrs.* (1942) 21 Cal.2d 399, 402 . . . .)' (*City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 276-277.)"

Applying these governing principles of statutory interpretation, we find that the Act uses only general language in describing the persons and entities that are subject to its provisions. A "subdivider" is defined as "a person, firm, corporation, partnership or association . . . ." (§ 66423.) Public agencies such as the University are not specifically included within the definition of a "subdivider" for purposes of the Act.

As for the "sovereign powers" of the University, we note that a public corporation known as the Regents of the University of California (hereinafter "Regents") administers the University and constitutes a "`statewide administrative body'" and "`a branch of the state itself.'" (*Regents of University of California* v. *City of Santa Monica* (1978) 77 Cal.App.3d 130, 135.) Subdivision (a) of section 9 of article IX of the Constitution provides in part:

"The University of California shall constitute a public trust to be administered by the existing corporation known as `The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the University and such competitive bidding procedures as may be applicable to the University by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. . . ."

With reference to the control of University property, subdivision (f) of the same constitutional provision states:

"The Regents of the University of California shall be vested with the legal title and the management and disposition of the property of the university and of property held for its benefit and shall have the power to take and hold, either by purchase or by donation, or gift, testamentary or otherwise, or in any other manner,

---

[2]We provided a similar analysis and conclusion in 62 Ops.Cal.Atty.Gen. 136 (1979) involving the sale of property by the 51st District Agricultural Association.

without restriction, all real and personal property for the benefit of the university or incidentally to its conduct; provided, however, that sales of university real property shall be subject to such competitive bidding procedures as may be provided by statute. Said corporation shall also have all the powers necessary or convenient for the effective administration of its trust, including the power to sue and to be sued, to use a seal, and to delegate to its committees or to the faculty of the university, or other others, such authority or functions as it may deem wise. . . ."

As previously indicated, the Act provides for extensive local government control of the design and improvements of a subdivision. If the Act were applicable to the University in the present circumstances, exercise of such control by a local authority might result in the University having to dedicate campus property for general park or recreational purposes, conform to particular lot size and configuration restrictions, provide for public thoroughfares, and comply with other requirements representing significant constraints on the University's ability to design the appropriate environment for campus faculty housing and to provide such housing at affordable prices.

The Constitution, however, vests the Regents with the management and disposition of University lands, and when using those lands for educational purposes, the powers of the Regents are virtually plenary. (See *San Francisco Labor Council* v. *Regents of the University of California*, (1980) 26 Cal.3d 785, 788; *Regents of the University of California* v. *City of Santa Monica, supra,* 77 Cal.App.3d at 136.) Providing for on-campus faculty housing serves the educational purposes of the University. As a means of attracting and retaining the highest qualified professors and improving the learning environment, such a program helps fulfill the University's educational mission and purpose.

We note that in a case involving a city's attempt to apply its building and zoning ordinances to the University's conversion of a commercial building to educational uses, the Court of Appeal held that "the University of California is not subject to local regulations with regard to its use or management of the property held by the Regents in public trust." (*Regents of the University of California* v. *City of Santa Monica*, *supra*, 77 Cal.App.3d at 136-137.)

On the other hand, in cases where locally exercised police powers have been successfully applied to the University, educational purposes were not directly at stake. In *City Street Improvement Co.* v. *Regents* (1908) 153 Cal. 776, the University was held subject to an assessment for a street improvement because it enhanced the value of the University's property and did not affect lands which were being used for school purposes. Similarly, in *Regents* v. *Superior Court*, *supra*, 17 Cal.3d 533, the court held that the University was subject to application of the state usury laws because "its investment decisions are not so closely related to its educational decisions to cloak the former with immunity even if the latter are immune." (*Id.* at 537.) There, the University had chosen to invest its endowment by extending loans to private borrowers, but in so doing it was acting in a capacity no different from any other investor in the open market. Investing to provide revenue for the operation of the University was not enough to establish an educational purpose.[3]

---

[3]In *Laurel Heights Improvement Ass'n.* v. *Regents of the University of California* (1988) 47 Cal.3d 376, an environmental impact report filed by the University in connection with the proposed relocation of biomedical research facilities to a newly acquired building in an off-campus residential area was found inadequate as an informative document. Because the Legislature intended the California Environmental Quality Act to be interpreted in such a manner as to afford the fullest possible protection to the environment and it specifically referred to governmental entities as being subject to its terms, there was no question that the University's project would have to comply with this statewide environmental statute. It was also assumed by the court that disposal of hazardous

Here, the University intends to design and improve its property in furtherance of its educational purposes. It will retain full title to the University land on which the faculty homes are built, and the homes themselves will eventually revert to the University for further use as faculty housing. The University's use of its property in this program is such an integral part of its land management prerogatives and so closely related to its educational decisions that the activities are not subject to the Act's provisions under principles of sovereign immunity.

Under the circumstances presented, therefore, we conclude that the University is not bound by the provisions of the Act when it constructs for-sale on-campus homes as part of a program to provide faculty housing.[4]

\* \* \* \*

wastes from the research facility would be subject to regulation by the California Department of Health Services.

Similarly, in 72 Ops.Cal.Atty.Gen 119 (1989), we determined that a campus pharmacy operated by the University was subject to the licensure, inspection, and disciplinary provisions of the Pharmacy Law as administered by the California State Board of Pharmacy. The Pharmacy Law was found to specifically apply to state governmental agencies and as a health regulation, "is unquestionably at the core of the State's police power." (*Kelly* v. *Johnson* (1976) 425 U.S. 238, 247.)

[4]Because of the conclusion reached, we need not consider whether the proposed project qualifies as a "subdivision." The University's land is apparently not "shown on the latest equalized county assessment roll" (§ 66424) due to its tax-exempt status. (See 59 Ops.Cal.Atty.Gen. 581, 583 (1976); 55 Ops.Cal.Atty.Gen. 414, 417 (1972).)