January 21, 1993

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1821

RALPH S. WEAVER, ETC., ET AL.,
Plaintiffs, Appellants,

v.

CHARLES HENDERSON, ETC., ET AL.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Stahl, Circuit Judge.

Kathleen M. McCarthy for appellants.

James T. Masteralexis on brief for International Brotherhood

of Police Officers, amicus curiae.
Rosemary S. Gale, Assistant Attorney General, with whom

Scott Harshbarger, Attorney General, was on brief, for appellees.

SELYA, Circuit Judge. In this case, the district court
SELYA, Circuit Judge.

refused to issue a preliminary injunction suspending the

Massachusetts State Police Department's "no mustache" policy.

The plaintiffs, veteran police officers partial to their existing

mustaches, prosecute this appeal. Finding no legal error or

abuse of discretion, we affirm the denial of interim relief.

I. BACKGROUND

In 1991, Massachusetts decided to merge four state

police forces (the Division of State Police, the Metropolitan

District Commission Police, the Capitol Police, and the Division

of Law Enforcement of the Registry of Motor Vehicles) into a

single entity (the Department of State Police). See An Act to

Consolidate Certain Police Forces in the Commonwealth, 1991 Mass.

Acts c. 412, at 985. When the enabling legislation was signed

into law, defendant-appellee Charles Henderson was the ranking

officer of the Division of State Police. Since the legislation

stipulated that Colonel Henderson, by virtue of his rank, would

serve as the "executive and administrative head" of the composite

force, id. at 990, he possessed power to "make all necessary

rules and regulations" for governance of, and discipline within,

the new department. Id. at 991. In addition, the law directed

him to establish a transition program to familiarize officers of

the component units with the new department's rules and practices

and to inculcate a unified mission. See id. at 1032.

Pursuant to his newly conferred statutory authority,

2

Colonel Henderson promulgated General Order 01 (the Order).1

The Order barred officers of the Department of State Police from

wearing mustaches on and after July 1, 1992, except for

undercover assignments or health reasons.2 In this respect, the

Order is substantially identical to a regulation that for

seventy-one years dictated the appearance of members of the

former Division of State Police, 1,213 strong as of 1991, who

1General Order 01 provides in pertinent part:

4.5.5 Hair may be tapered or blocked at
the sides but will not touch the ears.

4.5.6 Wigs or hairpieces may be worn if
they conform to standards for natural hair.

4.5.7 Faces will be clean shaven. NO
mustaches, beards or goatees except:

o Undercover officers with approval
of the Bureau Commander;

o Medical problems verified by a
medical practitioner with
documentation forwarded, through
channels, to the State Surgeon for
review and recommendations to the
Office of the Colonel/Super-
intendent.

4.5.8 Sideburns will be neatly trimmed
and rectangular in shape. They will not be
longer than the midpoint of the tragus of the
ear and will be:

o Trimmed horizontally, at a right angle;

o Of even width.

2Notwithstanding the Order's effective date, Colonel
Henderson provided that those who refused to put blade to face by
July 1 would be sworn into the new department as special state
police officers, enjoying "full police powers" until July 1,
1993.

3

comprise more than half the total membership of the 2,093-officer

consolidated force created by the 1991 legislation.

On May 21, 1992, six veteran officers of the former

Metropolitan and Registry police who had worn mustaches

throughout their law enforcement careers sued for declaratory and

injunctive relief, naming Colonel Henderson, the Commonwealth of

Massachusetts Department of Public Safety, and the Massachusetts

State Police as respondents. The plaintiffs simultaneously

sought a preliminary injunction to prevent the "no mustache" rule

from taking effect as scheduled. They claimed, inter alia, that

the Order, if implemented, would abridge their First and

Fourteenth Amendment rights by forcing them to sacrifice an

integral aspect of their personal identities.

Following the submission of affidavits, the district

court held a hearing on the prayer for interim injunctive relief.

At the conclusion of the hearing, the court allowed the parties

to file supplemental affidavits. After considering the

cumulative record, the court refused to meddle with

implementation of the Order, finding that the plaintiffs were

unlikely to succeed on the merits of their constitutional

challenge. This appeal ensued.

II. ANALYSIS

We rehearse the criteria applicable to interim

injunctive relief and then assess the supportability of the

ruling below.

A. Legal Standards.

4

Over time, we have developed a quadripartite test for

determining whether litigants are entitled to preliminary

injunctive redress. See Narragansett Indian Tribe v. Guilbert,

934 F.2d 4, 5 (1st Cir. 1991). The sine qua non of that

formulation is whether the plaintiffs are likely to succeed on

the merits.3 See id. at 6 (labeling this factor "critical");

Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st

Cir. 1981) (stating that "the probability-of-success component

has loomed large" in most cases), cert. denied, 455 U.S. 921

(1982). In the ordinary course, plaintiffs who are unable to

convince the trial court that they will probably succeed on the

merits will not obtain interim injunctive relief. See, e.g.,

LeBeau v. Spirito, 703 F.2d 639, 645 (1st Cir. 1983) (affirming

denial of preliminary injunction and ending inquiry after

concluding that plaintiffs were unlikely to prevail on the

merits).

When the district court applies the correct legal

standard in evaluating a motion for a preliminary injunction, its

decision to grant or deny relief is subject to abuse-of-

discretion review and will, therefore, be afforded considerable

respect. See Independent Oil & Chem. Workers of Quincy, Inc. v.

Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)

3The remaining aspects of the four-part test involve (1) the
potential for irreparable injury, (2) the relevant balance of
hardships if the restrainer does or does not issue, and (3) the
effect on the public interest of granting or withholding
temporary injunctive relief. See Narragansett Indian Tribe, 934

F.2d at 5.

5

(collecting cases). The court of appeals will find an abuse of

discretion in this wise only "when a material factor deserving

significant weight is ignored, when an improper factor is relied

upon, or when all proper and no improper factors are assessed,

but the [trial] court makes a serious mistake in weighing them."

Id.

B. Discussion.

In this case, the lower court apprehended the correct

legal standard and rested its ruling explicitly on the absence of

probable success. Thus, we are left to ponder a single question:

did the court misuse its discretion in concluding that the

plaintiffs would likely lose their case because of their

inability to demonstrate that the ban on mustaches was arbitrary?

The Supreme Court's opinion in Kelley v. Johnson, 425 U.S. 238

(1976), compels a negative answer to that inquiry.

In Kelley, plaintiffs brought a constitutional

challenge to a grooming regulation that was part of a network of

rules emphasizing "the overall need for discipline, esprit de

corps, and uniformity" within a police department. Id. at 246.

Acknowledging the deference due government agencies in

implementing their chosen organizational modes, see id. at 247,

the Court held that the plaintiffs could defeat the grooming

regulation only by showing that it was so irrational as to verge

on the arbitrary. See id. at 248. The regulation cleared this

rather modest hurdle because maintaining "similarity in

appearance," either to abet the public's easy recognition of

6

police officers or to promote a sense of "esprit de corps" among

the troopers themselves, was "a sufficiently rational

justification" for requiring that gendarmes be clean shaven. Id.

Kelley's grip on the instant case is unrelenting. The

Order at issue here is roughly comparable to that endorsed by the

Kelley Court. It is, therefore, presumptively valid. See id. at

247. The plaintiffs have not undermined this presumption in any

significant respect. They presented no evidence which would

compel a court to conclude that the Order is chimerical. To be

sure, they have argued that the "no mustache" rule lacks a

rational basis4 - but merely making such a claim does not prove

the point.

The sole factual support for plaintiffs' argument seems

to be the happenstance that other organizations, including the

United States Marine Corps and several state police forces, enjoy

a strong sense of camaraderie while permitting officers to sport

mustaches and other barbigerous adornments. Yet, rules are not

irrational simply because they differ from the rules employed by

other organizations with similar goals. See id. at 246 (holding

that the constitutional validity of an organizational structure,

with its implementing regulations, "does not depend . . . on any

doctrine of historical prescription").

4Appellants also asseverate that the "no mustache" rule is
arbitrary because it is the only grooming standard, of many
promulgated, that has been specifically enforced. However, the
record does not adequately support the asseveration. Even so, we
fail to see why a constitutionally valid rule would be rendered
invalid merely because other, similar rules are poorly enforced.

7

The plaintiffs' failure to adduce meaningful proof of

arbitrariness stands in stark contrast to the defendants'

proffer. Colonel Henderson's affidavit makes pellucidly clear

that the justification behind the "no mustache" rule is very much

the same type of rationale accepted by the Kelley Court and

consistently honored in later cases. See, e.g., Maciariello v.

Sumner, 973 F.2d 295, 300 (4th Cir. 1992); Egger v. Phillips, 710

F.2d 292, 319 (7th Cir.) (collecting cases), cert. denied, 464

U.S. 918 (1983); Waters v. Chaffin, 684 F.2d 833, 839 (11th Cir.

1982). Colonel Henderson explained that, when confronted with

the task of melding a cohesive unit instilled with a "common

purpose" and a "shared mission" from disparate parts, he thought

it highly desirable to begin from "a consistent starting point."

To that end, he concluded that "consistency in appearance" would

help to develop "shared pride" and "esprit de corps" among the

more than 2,000 men and women of the fledgling department. And,

inasmuch as the rule requiring officers to be clean shaven is the

same rule that previously governed the "old" State Police,

implementing a standard so closely identified with a majority of

the members of the "new" State Police would enhance the chances

of a successful consolidation.

Although the district court was not bound to accept the

Henderson affidavit at face value, it was certainly entitled to

credit the Colonel's assessment of the situation particularly

when, as in this instance, the Colonel's stated views were not

inherently implausible, internally inconsistent, or contradicted

8

by other credible evidence. At the preliminary injunction stage,

it is, after all, "the district court's duty and its

prerogative to assess the facts, draw whatever reasonable

inferences it might favor, and decide the likely ramifications."

Independent Oil & Chem. Workers, 864 F.2d at 933. The court

below appears to have followed this protocol faithfully. No more

was exigible.

III. CONCLUSION

We need go no further.5 "Likelihood of success cannot

be woven from the gossamer threads of speculation and surmise."

Narragansett Indian Tribe, 934 F.2d at 6. Here, Kelley cast a

large shadow over plaintiffs' case. The district court,

evaluating the dimensions of this shadow, denied preliminary

injunctive relief. Because plaintiffs have not persuaded us that

the lower court overlooked pertinent factors, focused on

inappropriate factors, or made a serious error in weighing and

5Given the weakness of plaintiffs' case on the merits, an
analysis of the other factors bearing on preliminary injunctive
relief would be supererogatory. See, e.g., Coalition for Basic

Human Needs v. King, 654 F.2d 838, 841 (1st Cir. 1981) (holding

that even "excruciatingly obvious" injury is irrelevant when a
plaintiff has not demonstrated likely success on the merits). We
pause, however, to note that, in their discussion of irreparable
harm, appellants mistakenly focus on the psychological damage an
altered facial appearance ostensibly creates. In light of
Colonel Henderson's decision delaying implementation of the
grooming rule, see supra note 2, the appropriate inquiry for

purposes of irreparable harm is not psychic harm, but whether the
mustachioed officers' temporary designations as special police
officers will have lasting effects.

9

balancing the relevant concerns, we cannot intervene. On this

jubate record, there is scant reason for suspending the "no

mustache" regulation.

The denial of the motion for preliminary injunction is

affirmed. Costs to appellees.

10