USCA1 Opinion

 

 January 21, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 92-1821 RALPH S. WEAVER, ETC., ET AL., Plaintiffs, Appellants, v. CHARLES HENDERSON, ETC., ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _________________________ Kathleen M. McCarthy for appellants. ____________________ James T. Masteralexis on brief for International Brotherhood _____________________ of Police Officers, amicus curiae. Rosemary S. Gale, Assistant Attorney General, with whom __________________ Scott Harshbarger, Attorney General, was on brief, for appellees. _________________ _________________________ _________________________ SELYA, Circuit Judge. In this case, the district court SELYA, Circuit Judge. _____________ refused to issue a preliminary injunction suspending the Massachusetts State Police Department's "no mustache" policy. The plaintiffs, veteran police officers partial to their existing mustaches, prosecute this appeal. Finding no legal error or abuse of discretion, we affirm the denial of interim relief. I. BACKGROUND I. BACKGROUND In 1991, Massachusetts decided to merge four state police forces (the Division of State Police, the Metropolitan District Commission Police, the Capitol Police, and the Division of Law Enforcement of the Registry of Motor Vehicles) into a single entity (the Department of State Police). See An Act to ___ Consolidate Certain Police Forces in the Commonwealth, 1991 Mass. Acts c. 412, at 985. When the enabling legislation was signed into law, defendant-appellee Charles Henderson was the ranking officer of the Division of State Police. Since the legislation stipulated that Colonel Henderson, by virtue of his rank, would serve as the "executive and administrative head" of the composite force, id. at 990, he possessed power to "make all necessary ___ rules and regulations" for governance of, and discipline within, the new department. Id. at 991. In addition, the law directed ___ him to establish a transition program to familiarize officers of the component units with the new department's rules and practices and to inculcate a unified mission. See id. at 1032. ___ ___ Pursuant to his newly conferred statutory authority, 2 Colonel Henderson promulgated General Order 01 (the Order).1 The Order barred officers of the Department of State Police from wearing mustaches on and after July 1, 1992, except for undercover assignments or health reasons.2 In this respect, the Order is substantially identical to a regulation that for seventy-one years dictated the appearance of members of the former Division of State Police, 1,213 strong as of 1991, who ____________________ 1General Order 01 provides in pertinent part: 4.5.5 Hair may be tapered or blocked at the sides but will not touch the ears. 4.5.6 Wigs or hairpieces may be worn if they conform to standards for natural hair. 4.5.7 Faces will be clean shaven. NO mustaches, beards or goatees except: o Undercover officers with approval of the Bureau Commander; o Medical problems verified by a medical practitioner with documentation forwarded, through channels, to the State Surgeon for review and recommendations to the Office of the Colonel/Super- intendent. 4.5.8 Sideburns will be neatly trimmed and rectangular in shape. They will not be longer than the midpoint of the tragus of the ear and will be: o Trimmed horizontally, at a right angle; o Of even width. 2Notwithstanding the Order's effective date, Colonel Henderson provided that those who refused to put blade to face by July 1 would be sworn into the new department as special state police officers, enjoying "full police powers" until July 1, 1993. 3 comprise more than half the total membership of the 2,093-officer consolidated force created by the 1991 legislation. On May 21, 1992, six veteran officers of the former Metropolitan and Registry police who had worn mustaches throughout their law enforcement careers sued for declaratory and injunctive relief, naming Colonel Henderson, the Commonwealth of Massachusetts Department of Public Safety, and the Massachusetts State Police as respondents. The plaintiffs simultaneously sought a preliminary injunction to prevent the "no mustache" rule from taking effect as scheduled. They claimed, inter alia, that _____ ____ the Order, if implemented, would abridge their First and Fourteenth Amendment rights by forcing them to sacrifice an integral aspect of their personal identities. Following the submission of affidavits, the district court held a hearing on the prayer for interim injunctive relief. At the conclusion of the hearing, the court allowed the parties to file supplemental affidavits. After considering the cumulative record, the court refused to meddle with implementation of the Order, finding that the plaintiffs were unlikely to succeed on the merits of their constitutional challenge. This appeal ensued. II. ANALYSIS II. ANALYSIS We rehearse the criteria applicable to interim injunctive relief and then assess the supportability of the ruling below. A. Legal Standards. A. Legal Standards. _______________ 4 Over time, we have developed a quadripartite test for determining whether litigants are entitled to preliminary injunctive redress. See Narragansett Indian Tribe v. Guilbert, ___ __________________________ ________ 934 F.2d 4, 5 (1st Cir. 1991). The sine qua non of that ____ ___ ___ formulation is whether the plaintiffs are likely to succeed on the merits.3 See id. at 6 (labeling this factor "critical"); ___ ___ Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st _______________ ______________________ Cir. 1981) (stating that "the probability-of-success component has loomed large" in most cases), cert. denied, 455 U.S. 921 _____ ______ (1982). In the ordinary course, plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief. See, e.g., ___ ____ LeBeau v. Spirito, 703 F.2d 639, 645 (1st Cir. 1983) (affirming ______ _______ denial of preliminary injunction and ending inquiry after concluding that plaintiffs were unlikely to prevail on the merits). When the district court applies the correct legal standard in evaluating a motion for a preliminary injunction, its decision to grant or deny relief is subject to abuse-of- discretion review and will, therefore, be afforded considerable respect. See Independent Oil & Chem. Workers of Quincy, Inc. v. ___ _______________________________________________ Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988) __________________________ ____________________ 3The remaining aspects of the four-part test involve (1) the potential for irreparable injury, (2) the relevant balance of hardships if the restrainer does or does not issue, and (3) the effect on the public interest of granting or withholding temporary injunctive relief. See Narragansett Indian Tribe, 934 ___ _________________________ F.2d at 5. 5 (collecting cases). The court of appeals will find an abuse of discretion in this wise only "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the [trial] court makes a serious mistake in weighing them." Id. ___ B. Discussion. B. Discussion. ___________ In this case, the lower court apprehended the correct legal standard and rested its ruling explicitly on the absence of probable success. Thus, we are left to ponder a single question: did the court misuse its discretion in concluding that the plaintiffs would likely lose their case because of their inability to demonstrate that the ban on mustaches was arbitrary? The Supreme Court's opinion in Kelley v. Johnson, 425 U.S. 238 ______ _______ (1976), compels a negative answer to that inquiry. In Kelley, plaintiffs brought a constitutional ______ challenge to a grooming regulation that was part of a network of rules emphasizing "the overall need for discipline, esprit de corps, and uniformity" within a police department. Id. at 246. ___ Acknowledging the deference due government agencies in implementing their chosen organizational modes, see id. at 247, ___ ___ the Court held that the plaintiffs could defeat the grooming regulation only by showing that it was so irrational as to verge on the arbitrary. See id. at 248. The regulation cleared this ___ ___ rather modest hurdle because maintaining "similarity in appearance," either to abet the public's easy recognition of 6 police officers or to promote a sense of "esprit de corps" among the troopers themselves, was "a sufficiently rational justification" for requiring that gendarmes be clean shaven. Id. ___ Kelley's grip on the instant case is unrelenting. The ______ Order at issue here is roughly comparable to that endorsed by the Kelley Court. It is, therefore, presumptively valid. See id. at ______ ___ ___ 247. The plaintiffs have not undermined this presumption in any significant respect. They presented no evidence which would compel a court to conclude that the Order is chimerical. To be sure, they have argued that the "no mustache" rule lacks a rational basis4 - but merely making such a claim does not prove the point. The sole factual support for plaintiffs' argument seems to be the happenstance that other organizations, including the United States Marine Corps and several state police forces, enjoy a strong sense of camaraderie while permitting officers to sport mustaches and other barbigerous adornments. Yet, rules are not irrational simply because they differ from the rules employed by other organizations with similar goals. See id. at 246 (holding ___ ___ that the constitutional validity of an organizational structure, with its implementing regulations, "does not depend . . . on any doctrine of historical prescription"). ____________________ 4Appellants also asseverate that the "no mustache" rule is arbitrary because it is the only grooming standard, of many promulgated, that has been specifically enforced. However, the record does not adequately support the asseveration. Even so, we fail to see why a constitutionally valid rule would be rendered invalid merely because other, similar rules are poorly enforced. 7 The plaintiffs' failure to adduce meaningful proof of arbitrariness stands in stark contrast to the defendants' proffer. Colonel Henderson's affidavit makes pellucidly clear that the justification behind the "no mustache" rule is very much the same type of rationale accepted by the Kelley Court and ______ consistently honored in later cases. See, e.g., Maciariello v. ___ ____ ___________ Sumner, 973 F.2d 295, 300 (4th Cir. 1992); Egger v. Phillips, 710 ______ _____ ________ F.2d 292, 319 (7th Cir.) (collecting cases), cert. denied, 464 _____ ______ U.S. 918 (1983); Waters v. Chaffin, 684 F.2d 833, 839 (11th Cir. ______ _______ 1982). Colonel Henderson explained that, when confronted with the task of melding a cohesive unit instilled with a "common purpose" and a "shared mission" from disparate parts, he thought it highly desirable to begin from "a consistent starting point." To that end, he concluded that "consistency in appearance" would help to develop "shared pride" and "esprit de corps" among the more than 2,000 men and women of the fledgling department. And, inasmuch as the rule requiring officers to be clean shaven is the same rule that previously governed the "old" State Police, implementing a standard so closely identified with a majority of the members of the "new" State Police would enhance the chances of a successful consolidation. Although the district court was not bound to accept the Henderson affidavit at face value, it was certainly entitled to credit the Colonel's assessment of the situation particularly when, as in this instance, the Colonel's stated views were not inherently implausible, internally inconsistent, or contradicted 8 by other credible evidence. At the preliminary injunction stage, it is, after all, "the district court's duty and its prerogative to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." Independent Oil & Chem. Workers, 864 F.2d at 933. The court _________________________________ below appears to have followed this protocol faithfully. No more was exigible. III. CONCLUSION III. CONCLUSION We need go no further.5 "Likelihood of success cannot be woven from the gossamer threads of speculation and surmise." Narragansett Indian Tribe, 934 F.2d at 6. Here, Kelley cast a _________________________ ______ large shadow over plaintiffs' case. The district court, evaluating the dimensions of this shadow, denied preliminary injunctive relief. Because plaintiffs have not persuaded us that the lower court overlooked pertinent factors, focused on inappropriate factors, or made a serious error in weighing and ____________________ 5Given the weakness of plaintiffs' case on the merits, an analysis of the other factors bearing on preliminary injunctive relief would be supererogatory. See, e.g., Coalition for Basic ___ ____ ___________________ Human Needs v. King, 654 F.2d 838, 841 (1st Cir. 1981) (holding ___________ ____ that even "excruciatingly obvious" injury is irrelevant when a plaintiff has not demonstrated likely success on the merits). We pause, however, to note that, in their discussion of irreparable harm, appellants mistakenly focus on the psychological damage an altered facial appearance ostensibly creates. In light of Colonel Henderson's decision delaying implementation of the grooming rule, see supra note 2, the appropriate inquiry for ___ _____ purposes of irreparable harm is not psychic harm, but whether the mustachioed officers' temporary designations as special police officers will have lasting effects. 9 balancing the relevant concerns, we cannot intervene. On this jubate record, there is scant reason for suspending the "no mustache" regulation. The denial of the motion for preliminary injunction is The denial of the motion for preliminary injunction is _______________________________________________________ affirmed. Costs to appellees. affirmed. Costs to appellees. ________ __________________ 10