WYNN, Circuit Judge,
concurring in the judgment:
Defendant Shaquille Robinson concedes that law enforcement officers reasonably suspected that he was carrying a firearm.[1] Defendant further concedes that the law enforcement officers lawfully stopped him for an unrelated, albeit pretextual, reason. I agree with the majority that these facts alone allowed the officers to perform a protective frisk of Defendant during the stop.
In reaching this conclusion, the majority frames this case as a run-of-the-mill search-and-seizure case involving a traffic stop in which we must assess whether law enforcement officers had reasonable suspicion to frisk Defendant based on the facts known to the officers at the time they conducted the frisk. To that end, the majority focuses on the dangers law enforcement officers face in conducting lawful stops, particularly traffic stops, and the officers’ reasonable suspicion that Defendant had a “weapon.”
But this case is not about traffic stops or “weapons”—it is about firearms and the danger they pose to law enforcement officers. In particular, this case arises from the Defendant’s presumptively lawful activity of carrying a firearm, which became the basis for making a pretextual, albeit lawful, stop for not wearing a seatbelt. From these remarkable facts, the majority opinion reduces the issue in this case to whether the officers justifiably frisked Defendant, after a lawful stop, because they had a “tip” that Defendant carried a “weapon.”
By focusing on the officers’ justification—rather than Defendant’s presumptively lawful decision to carry a firearm— the majority elides discussion of the two key issues in this case: (1) whether individuals who carry firearms—lawfully or unlawfully—pose a categorical risk of danger to others and police officers, in particular, and (2) whether individuals who choose to carry firearms forego certain constitutional protections afforded to individuals who elect not to carry firearms. As explained in more detail below, the majority opinion’s attempt to duck these questions is futile because its conclusion necessarily answers “yes” to both questions.
*703 I.
First, the majority opinion altogether avoids addressing the first issue—whether individuals who carry firearms (lawfully or unlawfully) pose a categorical risk of danger to others—by reinterpreting the Supreme Court’s long-established test for determining whether law enforcement officers lawfully performed a protective frisk. Under that test, the question is whether the officers had “reasonable suspicion that the person subjected to the frisk is armed and dangerous.” Arizona v. Johnson, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (1997). Instead of according “dangerous” an independent meaning, the majority contends that “armed and dangerous” is a unitary concept—if law enforcement officers reasonably suspect a detainee is “armed,” they necessarily reasonably suspect he is “dangerous.” Ante at 700 (“[T]he risk of the danger is created simply because the person, who was forcibly stopped, is armed”). I disagree with the majority opinion’s contention that “armed and dangerous” is a unitary concept.
To be sure, from the outset, stripping “dangerous” of independent meaning violates the long-standing principle that elements separated by a conjunctive should be interpreted as distinct requirements. See, e.g., Crooks v. Harrelson, 282 U.S. 55, 58, 51 S.Ct. 49, 75 L.Ed. 156 (1932); Am. Paper Inst. v. U.S. E.P.A., 660 F.2d 954, 961 (4th Cir. 1981). That is why other Circuits have held that law enforcement officers must reasonably suspect a detainee is “both armed and a danger to the safety of officers or others” before conducting a frisk. United States v. Leo, 792 F.3d 742, 748 (7th Cir. 2015) (emphasis added); Northrup v. City of Toledo Police Dep’t, 785 F.3d 1128, 1132 (6th Cir. 2015) (“Clearly established law required [the officer] to point to evidence that [the subject] may have been armed and dangerous. Yet all he ever saw was that [the subject] was armed—and legally so.” (emphasis in original) (citation and internal quotation marks omitted)).
The view of the other Circuits on according “dangerous” an independent meaning makes sense because the majority opinion’s unitary meaning interpretation would allow law enforcement officers to frisk a wide swath of lawfully stopped individuals engaging in harmless activity. Indeed, by definition, an individual is “armed” if he is “[e]quipped with a weapon.” Armed, Black’s Law Dictionary (9th ed. 2009).
To illustrate the absurdity of the majority opinion’s unitary meaning interpretation, consider, for example, that courts have found a bottle to be a “weapon.” See United States v. Daulton, 488 F.2d 524, 525 (5th Cir. 1973) (“Courts have held that a wine bottle can be a dangerous weapon.”). Under the majority’s unitary meaning interpretation, officers informed that an individual was leaving a convenience store “armed” with a bottle of wine could, after a lawful stop, frisk that individual because, in the majority’s words, “the risk of the danger is created simply because the person, who was forcibly stopped, is armed.” Ante at 700.
As Justice Brennan noted, numerous everyday objects turn into “weapons” when put to appropriate use:
A “weapon” could include a brick, a baseball bat, a hammer, a broken bottle, a fishing knife, barbed wire, a knitting needle, a sharpened pencil, a riding crop, a jagged can, rope, a screw driver, an ice pick, a tire iron, garden shears, a pitch fork, a shovel, a length of chain, a penknife, a fork, metal pipe, a stick, etc. The foregoing only illustrate the variety of lawful objects which are often innocently possessed without wrongful intent.
*704 Wright v. New Jersey, 469 U.S. 1146, 1149 n.3, 105 S.Ct. 890, 83 L.Ed.2d 906 (1985) (Brennan, J., dissenting from dismissal for want of substantial federal question). Under the majority opinion’s unitary meaning interpretation, reasonable suspicion that an individual possessed any of these items would give rise to reasonable suspicion to frisk the individual, after a lawful stop, even absent any evidence the individual intended to use the object as a weapon. The Fourth Amendment does not contemplate giving law enforcement officers such wide-ranging authority to engage in war-rantless frisks of detainees. See, e.g., City of Los Angeles v. Patel, — U.S. —, 135 S.Ct. 2443, 2455, 192 L.Ed.2d 435 (2015) (holding that courts must not interpret the Fourth Amendment in a way that allows the “narrow exceptionfe]” to the warrant requirement “to swallow the rule”); United States v. Wilson, 953 F.2d 116, 126 (4th Cir. 1991) (refusing to allow “limited Terry exception to swallow the rule”).
The majority nonetheless contends that the Supreme Court “deliberately linked ‘armed’ and ‘dangerous’ ” in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), by approving frisks because the officers “reasonably believed that the person stopped ‘was armed and thus dangerous.” Ante at 700 (quoting Terry, 392 U.S. at 28, 88 S.Ct. 1868; Mimms, 434 U.S. at 112, 98 S.Ct. 330). But when the Supreme Court has elaborated on the test for a lawful frisk, it has highlighted the independent role of “dangerousness,” holding that Terry authorizes a “frisk” of an automobile when law enforcement officers reasonably suspect “that the suspect is dangerous and the suspect may gain immediate control of weapons.” Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
How then do we reconcile the language in Terry and Mimms, upon which the majority relies, with Long and the plain language of the test, which requires that officers reasonably suspect an individual is both armed and dangerous? The answer plainly lies in the type of “weapon” at issue.
In Long, the officers reasonably suspected that the defendant had a knife. 463 U.S. at 1050, 103 S.Ct. 3469. By contrast, in Terry and Mimms, the officers reasonably suspected the detainees had firearms. Terry, 392 U.S. at 6-7, 88 S.Ct. 1868; Mimms, 434 U.S. at 106, 98 S.Ct. 330. Accordingly, Terry and Mimms collapse the “armed and dangerous” test into a single inquiry only when law enforcement officers reasonably suspect that a detainee has a firearm or other inherently dangerous weapon. Such a reading ensures that the “armed” and “dangerous” prongs retain distinct meaning and places meaningful restrictions on law enforcement officers’ ability to frisk lawfully stopped individuals.
But the majority opinion also contends that we should collapse the “armed and dangerous” test into a single inquiry— regardless of the type of “weapon” with which the detainee is “armed”—because the combination of a “forcible stop” and an armed detainee poses a “risk of danger.” Ante at 700 (“[T]he risk of danger is created simply because the person, who was forcibly stopped, is armed.”). Yet committing a minor traffic violation—a seatbelt violation here—provides no basis to believe an individual poses any special danger warranting departure from the rule that law enforcement officers may not, as a general matter, frisk lawfully detained individuals. Likewise, as explained above, given the numerous objects that can constitute “weapons,” being “armed” does not, by itself, establish that an individual poses *705 a danger. Rather, what the majority opinion skillfully avoids is that the “risk of danger” to the officers arose from the officers’ reasonable suspicion Defendant was carrying a firearm.
Confronting the inescapable reality that lawfully-stopped individuals armed with firearms are categorically dangerous reflects the heightened danger posed by firearms. To that end, the Supreme Court has held that “a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous.” McLaughlin v. United States, 476 U.S. 16, 17, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986). This Court also has recognized “the substantial risk of danger and the inherently violent nature of firearms,” Pelissero v. Thompson, 170 F.3d 442, 447 (4th Cir. 1999) (quotation omitted), as have other Circuits, e.g., United States v. Copening, 506 F.3d 1241, 1248 (10th Cir. 2007) (characterizing a “loaded gun [as] by any measure an inherently dangerous weapon”); Love v. Tippy, 133 F.3d 1066, 1069 (8th Cir. 1998) (recognizing “the inherently violent nature of firearms, and the danger firearms pose to all members of society”); United States v. Allah, 130 F.3d 33, 40 (2d Cir. 1997) (“[F]irearms are inherently dangerous devices.”).
Indeed, the Supreme Court’s decision in District of Columbia v. Heller—which first recognized the individual right to carry firearms—is premised on the dangerousness of carrying firearms. In particular, Heller held that the Second Amendment affords individuals the right to keep and use handguns for the “defense” and “protection of one’s home and family”—for example, to ward off “attacker[s]” or threaten “burglar[s].” 554 U.S. 570, 628-29, 128 S.Ct. 2783,171 L.Ed.2d 637 (2008) (emphasis added). If a lawfully possessed firearm did not pose a danger to attackers, burglars, or other threatening individuals, there would be no need for individuals to own and carry firearms for protection.
And the widespread judicial recognition of the inherent dangerousness of firearms accords with the evidence. The Department of Justice reported that in 2011, the most recent year for which comprehensive statistics are available, a total of 478,400 fatal and nonfatal violent crimes were committed with a firearm. Michael Planty & Jennifer L. Truman, U.S. Dep’t of Justice, Bureau of Justice Stats., Special Report: Firearm Violence, 1993-2011, at 1 (May 2013). Likewise, firearms are a leading cause of injury-related death in the United States and have been for many years. Jonathan E. Selkowitz, Comment, Guns, Public Nuisance, and the PLCAA: A Public Health-Inspired Legal Analysis of the Predicate Exception, 83 Temp. L. Rev. 793, 801-02 (2011); see also Centers for Disease Control & Prevention, Nat’l Ctr. for Health Stats., Underlying Cause of Death 1999-2014 on CDC WONDER Online Database, http://wonder.cdc.gov/ucdicd 10.html (queried on Nov. 18, 2016) (reporting that there were 497,632 intentional firearms deaths between 1999 and 2014). Accordingly, as a matter of law and fact, firearms—and therefore individuals who choose to carry firearms—are inherently dangerous.
In sum, individuals who carry firearms—lawfully or unlawfully—pose a risk of danger to themselves, law enforcement officers, and the public at large. Accordingly, law enforcement officers may frisk lawfully stopped individuals whom the officers reasonably suspect are carrying a firearm because a detainee’s possession of a firearm poses a categorical “danger” to the officers.
*706 II.
Having determined that individuals who are armed with a firearm are categorically “dangerous,” we confront the second issue—whether individuals who choose to carry firearms sacrifice certain constitutional protections afforded to individuals who elect not to carry firearms. We must confront this issue because treating individuals armed with firearms—lawfully or unlawfully—as categorically dangerous places special burdens on such individuals. Today we recognize one such burden: individuals who carry firearms elect to subject themselves to being frisked when lawfully stopped by law enforcement officers.
I see no basis—nor does the majority opinion provide any—for limiting our conclusion that individuals who choose to carry firearms are categorically dangerous to the Terry frisk inquiry. Accordingly, the majority decision today necessarily leads to the conclusion that individuals who elect to carry firearms forego other constitutional rights, like the Fourth Amendment right to have law enforcement officers “knock-and-announce” before forcibly entering homes. See Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (“In order to justify a ‘no-knock’ entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile.” (emphasis added)). Likewise, it is difficult to escape the conclusion that individuals who choose to carry firearms necessarily face greater restriction on their concurrent exercise of other constitutional rights, like those protected by the First Amendment. See Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.) (“The question in every [freedom of speech] case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.” (emphasis added)).
The Supreme Court has long recognized that “[t]he promotion of safety of persons and property is unquestionably at the core of the State’s police power,” Kelley v. Johnson, 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), and “the structure and limitations of federalism .., allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons,” Gonzales v. Oregon, 546 U.S. 243, 270, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). Thus, like most rights, the right protected by the Second Amendment—which Defendant’s conduct may or may not implicate[2]—“is not unlimited” and therefore does not amount to “a right to keep and carry any weapon whatsoever *707 in any manner whatsoever and for whatever purpose.” Heller, 554 U.S. at 626, 128 S.Ct. 2788. In particular, today’s majority opinion necessarily recognizes that the limitations on the right to carry firearms derive not only from the language of the Second Amendment—as Heller recognized—but also from other provisions in the Constitution, which protect law enforcement officers and the public at large from individuals who elect to engage in dangerous activities, like the carrying of firearms.
III.
In sum, because the carrying of a firearm poses a categorical danger to others— in this case, law enforcement officers—the law enforcement officers lawfully frisked Defendant, after lawfully detaining him, based on information that he carried a firearm. Accordingly, I concur in the majority opinion’s decision to affirm Defendant’s convictions.

. The majority states that the law enforcement officers received a "tip” that Defendant was carrying a loaded firearm. Ante at 695-96.
Carrying a loaded firearm in West Virginia is presumptively lawful activity. Thus, information that an individual is engaging in presumptively lawful activity should not constitute a "tip” for purposes of this analysis.

. Although we have expressly declined to resolve whether the right recognized in Heller extends beyond the home, United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011), other courts are divided on the question, compare Moore v. Madigan, 702 F.3d 933, 936 (7th Cir. 2012) (recognizing that the "right to keep and bear arms for personal self-defense ... implies a right to carry a loaded gun outside the home”); Palmer v. Dist. of Columbia, 59 F.Supp.3d 173, 181-82 (D.D.C. 2014) (holding that Second Amendment right recognized in Heller extends beyond home), with Peruta v. Cnty. of San Diego, 824 F.3d 919, 940 (9th Cir. 2016) ("[T]he Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public.” (emphasis added)); Young v. Hawaii, 911 F.Supp.2d 972, 990 (D. Haw. 2012) (“[L]imitations on carrying weapons in public do[ ] not implicate activity protected by the Second Amendment.”); Williams v. State, 417 Md. 479, 10 A.3d 1167, 1178 (Md. 2011) (holding that regulations on carrying firearms outside the home aré "outside of the scope of the Second Amendment, as articulated in Heller and McDonald”).